**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ALAH DAYWALT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV277 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**<u>MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE</u>**

Plaintiff, Alah Daywalt, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 11 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 15; <u>see also</u> Docket Entry 14 (Plaintiff's Memorandum); Docket Entry 16 (Defendant's Memorandum); Docket Entry 17 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for SSI, alleging a disability onset date of January 5, 2016 (Tr. 177-86) and, upon denial of that application initially (Tr. 68-80, 95-98), and on reconsideration (Tr. 81-94, 106-15), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 116-18). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 28-67.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 9-27.) The Appeals Council denied Plaintiff's request for review (Tr. 1-6, 173-76), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings, later adopted by the Commissioner:

1. [Plaintiff] has not engaged in substantial gainful activity since March 22, 2016, the application date.

2. [Plaintiff] has the following severe impairments: diabetes mellitus, hyperlipidemia, status post [cerebrovascular accident ("CVA")] with residual hemiparesis; obesity; coronary artery disease, status post myocardial infarction and status post [automated implantable cardioverter defibrillator ("AICD")] placement.

. . .

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

. . .

4.    . . . [Plaintiff] has the residual functional capacity to perform light work . . . except frequent climbing of ramps and stairs, but only occasional climbing of ladders (up to 4-vertical feet in height). No climbing of higher ladders or of ropes or scaffolds of any height. Frequent balancing, stooping, kneeling and crouching; occasional crawling; frequent reaching, handling, fingering, pushing and pulling with the left upper (non-dominant) extremity. Frequent pushing and pulling with the left lower extremity. Occasional exposure to extreme cold and heat. Occasional exposure to vibration, atmospheric conditions, moving mechanical parts and high exposed place [sic]. No production pace work on assembly lines. May not work in close proximity (i.e. within 15-feet) of power generators, arc welding equipment, jumper cables or equipment utilizing powerful magnets such as MRI equipment, electromagnetic lifting equipment and similar industrial equipment.

. . .

5.    [Plaintiff] has no past relevant work.

. . .

9.    Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . .

10.   [Plaintiff] has not been under a disability, as defined in the . . . Act, since March 22, 2016, the date the application was filed.

(Tr. 14-22 (bold font and internal parenthetical citations omitted).)

3

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u>

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award

---

[2] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." <u>Id.</u> at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. <u>See id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<i>e.g.</i>, pain)." <u>Hines</u>, 453 F.3d at 562-63.

7

both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to adequately evaluate and account for the effects of Plaintiff's [shortness of breath ('SOB')] and edema due to chronic [congestive heart failure ('CHF')] when assessing her RFC" (Docket Entry 14 at 4 (bold font and single-spacing omitted));

2) "[t]he ALJ erred by failing to adequately evaluate and account for the effects of Plaintiff's [lower left extremity ('LLE')] sensation loss when assessing her ability to work" (id. at 11 (bold font and single-spacing omitted));

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

3) "[t]he ALJ erred in his treatment of the medical opinion evidence" (id. at 13 (bold font omitted); see also Docket Entry 17 at 1-3); and

4) "[t]he ALJ erred by failing to evaluate whether Plaintiff's CHF medically equals Listing 4.02" (Docket Entry 14 at 16 (bold font and single-spacing omitted); see also Docket Entry 17 at 3-5).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 16 at 10-24.)

## 1. Additional Standing and Walking Limitations

In Plaintiff's first and second assignments of error, she maintains that "[t]he ALJ failed to adequately evaluate and account for the effects of Plaintiff's SOB and edema due to chronic CHF when assessing her RFC" (Docket Entry 14 at 4 (bold font and single-spacing omitted)), and "failed to adequately evaluate and account for the effects of Plaintiff's LLE sensation loss when assessing her ability to work" (id. at 11 (bold font and single-spacing omitted)).[6] For the reasons that follow, those assertions entitle Plaintiff to no relief.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 416.945(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's

_____

[6] Due to the similarities in Plaintiff's first and second assignments of error, the undersigned will address them together.

impairments, as well as any related symptoms, including pain.  See
Hines, 453 F.3d at 562-63; 20 C.F.R. § 416.945(b).  The ALJ then
must match the claimant's exertional abilities to an appropriate
level of work (i.e., sedentary, light, medium, heavy, or very
heavy).  See 20 C.F.R. § 416.967.  Any non-exertional limitations
may further restrict a claimant's ability to perform jobs within an
exertional level.  See 20 C.F.R. § 416.969a(c).

"The RFC assessment must include a narrative discussion
describing how the evidence supports each conclusion, citing
specific medical facts (e.g., laboratory findings) and nonmedical
evidence (e.g., daily activities, observations). . . .  The [ALJ]
must also explain how any material inconsistencies or ambiguities
in the evidence in the case record were considered and resolved."
Social Security Ruling 96-8p, Policy Interpretation Ruling Titles
II and XVI: Assessing Residual Functional Capacity in Initial
Claims, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p").
Although the ALJ need not discuss every piece of evidence in making
an RFC determination, see Reid v. Commissioner of Soc. Sec., 769
F.3d 861, 865 (4th Cir. 2014), he or she "must both identify
evidence that supports his [or her] conclusion and build an
accurate and logical bridge from that evidence to [that]
conclusion," Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018)
(internal emphasis, quotation marks, and brackets omitted).  Here,
as explained in more detail below, the ALJ's decision supplies the

10

necessary "accurate and logical bridge," id. (internal quotation marks omitted), between his discussion of the evidence and the RFC assessment.

**a. SOB, Fatigue, and Edema**

Plaintiff first contends that, in light of her testimony regarding difficulty breathing, fatigue, and lower extremity swelling (see Docket Entry 14 at 4-5 (citing Tr. 39, 41-44, 47-49, 54-55)), the ALJ did not sufficiently explain his finding that Plaintiff remained capable of performing "the full walking and standing range of light work" (id. at 5), and failed to build "an 'accurate and logical bridge'" from the evidence to that conclusion (id. at 6 (quoting Woods, 888 F.3d at 694)). According to Plaintiff, "completely absent from [the ALJ's] decision is any real discussion of how [Plaintiff's] SOB upon exertion, fatigue and edema due to chronic CHF do not limit her to walking short distances, taking breaks from activity every few minutes or having to elevate her feet when they swell as she testified." (Id.) Plaintiff characterizes the ALJ's error in that regard as "very harmful," arguing that, "despite the ALJ's impression that [Plaintiff]'s heart problems largely subsided after her January 2016 heart attack, stenting procedures and [A]ICD placement, the record actually reveals that she continued to suffer from ongoing, serious symptoms from CHF including listing level depressed left ventricular ('LV') functioning." (Id. (internal parenthetical

11

citations omitted); see also id. at 6-10 (detailing evidence Plaintiff believes supports the inclusion in the RFC of greater standing and walking restrictions, as well as additional breaks to permit her to elevate her feet (citing Tr. 269-73, 280, 298-99, 344, 364, 376, 401, 408, 412, 414, 461, 476, 482-83, 486, 490-91, 494, 513, 562, 564, 572-73, 605-06, 642, 654, 657-58, 668, 693, 695, 703-05, 765-66, 769-70, 780, 782, 786, 788, 790, 799, 802-03, 816, 903, 905, 910, 912-13, 920-21, 941, 946, 968)).)  Those arguments fall short.

As an initial matter, the ALJ acknowledged Plaintiff's testimony that her heart condition "affects her ability to breathe" as well as that "her feet swell and she becomes very tired" (Tr. 16; see also Tr. 39); however, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision" (Tr. 19).  Significantly, Plaintiff did not challenge the ALJ's finding in that regard.  (See Docket Entries 14, 17.)

Moreover, the evidence Plaintiff cites would not have compelled the ALJ to adopt greater standing and walking limitations or include in the RFC additional breaks to allow Plaintiff to elevate her feet.  Although a transthoracic echocardiogram ("ECG") on October 13, 2017, reflected a left ventricular ejection fraction

12

("LVEF") of 30 to 35 percent (see Tr. 815-16), that result, standing alone, does not establish that Plaintiff experienced severe SOB, fatigue, and/or edema during that time, particularly when contemporaneous records reflect normal findings in that regard (see Tr. 769-71 (9/3/17 - oxygen saturation 100%, normal breath sounds, no edema), 780-86 (10/8/17 - tachycardia but no edema, negative chest x-ray, oxygen saturation 100% on room air), 790 (10/21-10/22/17 - slight wheezing in setting of asthma exacerbation due to exposure to bonfire and cigarettes but oxygen saturation 100% on room air, no edema), 799 (10/9/17 - tachycardia but oxygen saturation 100% on room air)).[7]

Plaintiff further maintains that "[h]er LVEF was remeasured in December of 2017 [at] only 20%" (Docket Entry 14 at 9 (citing Tr. 968)) and "again measured at only 20%" on May 10, 2018 (id. at 10 (citing Tr. 941)). That evidence, however, consists of AICD interrogation reports which merely listed Plaintiff's LVEF at the time of the AICD's implantation on January 15, 2016. (Compare Tr. 941 (5/10/18 - LVEF 20%), 968 (12/13/17 - LVEF 20%), with Tr. 272, 288, 297-98, 331-333 (1/5/16 - LVEF 20-25%).) Indeed, the report dated December 13, 2017, lacks any specific findings and a clinician's signature (see Tr. 968-72), and the report of May 10, 2018, shows 19 instances of non-sustained supraventricular

---

[7] Additionally, an ECG performed less than two months earlier (on August 18, 2017) measured Plaintiff's LVEF at 50 to 55 percent. (See Tr. 749.)

tachycardia ("SVT") on December 18, 2017, in the setting of significant gastrointestinal upset and dehydration but otherwise normal sinus rhythm (see Tr. 941-47).

Furthermore, a large portion of the evidence upon which Plaintiff relies pertains to the time period during which Plaintiff suffered two acute, cardiovascular events, i.e., her heart attack and stroke in January and March 2016, respectively (see Docket Entry 14 at 6-7 (citing Tr. 269-73, 280, 298-99, 344, 364, 376, 401, 408, 412, 414, 461, 476, 486, 490-91, 494)); however, the ALJ clearly acknowledged the seriousness of both events, as he found at step two that Plaintiff suffered from severe "status post CVA with residual hemiparesis" and severe "status post myocardial infarction [with] AICD placement" (Tr. 14) and discussed both hospitalizations in a fair amount of detail in connection with his RFC analysis (see Tr. 17). Moreover, as such evidence reflects Plaintiff's symptoms during and in the immediate aftermath of her heart attack and stroke, it does not support Plaintiff's argument that the ALJ erroneously found that Plaintiff's "heart problems largely subsided after her January 2016 heart attack, stenting procedures and [A]ICD placement" (Docket Entry 14 at 6 (emphasis added)).

The remaining evidence cited by Plaintiff, only some of which reflects her subjective complaints of SOB, leg swelling, and fatigue (which the ALJ discounted (see Tr. 19)), contains objectively normal findings in those areas (see Tr. 482-83 (4/19/16

14

- no edema, no dyspnea, good air movement, normal gait, strength improved), 512-13 (5/24/16 - normal ambulation, no edema, no dyspnea, good air movement), 572-73 (6/27/16 - no dyspnea, good air movement, no edema, normal gait, full strength), 605-07 (10/27/16 - no edema, good air movement, full strength, overall doing great, essentially no residual deficits from CVA), 642 (10/28/16 - oxygen saturation 100% on room air, normal ambulation, no dyspnea, good air movement, full strength, no edema, normal sensation, reflexes, pulses, and coordination), 654-58 (4/3/17 - noting cane usage and irregular gait but no dyspnea, good air movement, full strength, no edema, no signs of CHF decompensation), 668-72 (1/4/17 - noting multiple visits to emergency room for <u>nausea and vomiting</u> but oxygen saturation 100% on room air), 693-95 (5/4/17 - normal chest x-ray, normal strength and sensation), 703-05 (6/4/17 - no edema), 765-66 (7/4/17 - decreased breath sounds in lung bases and <u>trace</u> edema, but oxygen saturation 100% on room air, chest x-ray negative, full strength, normal pulses), 769-71 (9/3/17 - oxygen saturation 100%, normal breath sounds, no edema), 780-86 (10/8/17 - tachycardia but no edema, negative chest x-ray, oxygen saturation 100% on room air), 790 (10/21-10/22/17 - <u>slight</u> wheezing in setting of asthma exacerbation due to exposure to bonfire and cigarettes but oxygen saturation 100% on room air, no edema), 799 (10/9/17 - tachycardia but oxygen saturation 100% on room air), 802-03 (10/16/17 - Holter Monitor report showing rare premature

15

ventricular contractions ("PVCs"), no ventricular tachycardia, no atrial fibrillation, and no evidence of "re-entrant" supraventricular tachycardia ("SVT"), 903 (6/29/17 - negative chest x-ray), 905 (7/28/17 - negative chest x-ray), 910-13 (5/10/18 - doing well, looks better than previous visits, oxygen saturation 100%, normal gait), 920-21 (5/24/18 - stable CHF, doing well except right arm pain and heartburn, oxygen saturation 99%)).

Put simply, Plaintiff has not shown that the ALJ improperly evaluated Plaintiff's complaints of SOB, fatigue, and edema.

**b. LLE Sensation Loss**

With regard to Plaintiff's loss of sensation in the LLE, she faults the ALJ for failing to "reconcile how [Plaintiff's] LLE numbness allow[ed] her to stand and walk for a majority of the day" as required by the light-exertion RFC. (Docket Entry 14 at 11.) Plaintiff deems that error "harmful, as the record reveals, consistent with her testimony, that she <u>completely lacks</u> sensation in the left foot (to allow for proper proprioception) since her March 2016 stroke." (<u>Id.</u> (emphasis added); <u>see also</u> <u>id.</u> at 11-12 (describing evidence Plaintiff contends supports greater standing and walking restrictions in the RFC (citing Tr. 370, 375, 379, 382, 385-86, 498, 575, 580-83, 645, 662, 645, 688, 690, 728, 742, 916)).) Those contentions fail to warrant remand.

Here, the ALJ acknowledged Plaintiff's testimony that she constantly experiences "pain and a tingly feeling in the bottom of

16

both feet and her toes" (Tr. 17; see Tr. 41-42) but, as explained above, found that "[Plaintiff]'s statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 19), and Plaintiff did not contest that finding (see Docket Entries 14, 17.) Moreover, in further support of that finding, the ALJ noted that he "afforded [Plaintiff] the benefit of the doubt, when evaluating the consistency of her statements with the findings in the objective medical evidence" (Tr. 18), and recognized that, despite Plaintiff's claim of LLE numbness, "[i]n general, [Plaintiff]'s gait [was] normal, with only a few instances of irregular or abnormal gait noted." (Tr. 18; see also Tr. 20 ("[G]ait [wa]s generally documented as normal without any mention of an assistive device.").) The ALJ further observed that, although Plaintiff had "balance difficulty initially after her stroke," the record contained "no consistent documented use of a cane apart from a note in April 2017." (Id.)

Furthermore, the evidence Plaintiff cites would not have compelled the ALJ to find greater standing and walking limitations to account for Plaintiff's LLE sensation loss. To the extent Plaintiff relies on medical records generated at the time of her stroke in March 2016 (see Docket Entry 14 at 11-12 (citing Tr. 370, 375, 379, 382, 386)), such evidence does not bolster Plaintiff's

17

argument "that she completely lack[ed] sensation in her left foot (to allow for proper proprioception) <u>since</u> her March 2016 stroke" (<u>id.</u> at 11 (emphasis added)). Other evidence to which Plaintiff points contains objective findings of LLE numbness, but lacks any indication that such numbness impacted Plaintiff's ability to stand and walk. (<u>See</u> Tr. 498-500 (4/19/16 - cardiologist office visit describing "only residual deficit" from Plaintiff's stroke as "left foot numbness" and characterizing same as amounting to "essentially no residual deficits," as well as noting Plaintiff "doing great" and could "shop in Wal-Mart without issues"), 645 (9/27/16 - primary care physician finding no sensation in left foot but noting normal ambulation, gait, and station), 662 (2/22/17 - same), 667 (2/6/17 - same), 728-42 (8/18/17 - hospitalization for LLE numbness which resolved in 15 to 30 minutes with Plaintiff able to ambulate), 916 (1/8/18 - primary care visit for blisters on feet resulting from Plaintiff's inability to feel foot warmers).)[8]

Still other evidence relied upon by Plaintiff, although in large part reflecting her <u>subjective</u> complaints of LLE numbness (which the ALJ discounted (<u>see</u> Tr. 19)), documents <u>objectively</u>

---

[8] Significantly, during that hospitalization, Plaintiff advised her treatment providers that she "typically" experienced "paresthesias," but that this <u>total</u> loss of sensation "was different." (Tr. 728.) Plaintiff further "endorsed previous history for diabetic neuropathy," but "denied ever having any focal neurologic deficits" or the "severe symptomatology she felt earlier" that day. (Tr. 731.) Thus, despite Plaintiff's claim that she "<u>completely lacked</u> sensation in her left foot" (Docket Entry 14 at 11 (emphasis added)), she admitted that a <u>total</u> loss of sensation in her left foot occurred on only this one occasion, may have resulted from her sleeping on her left side (<u>see</u> Tr. 732), and resolved within 15 to 30 minutes (<u>see</u> Tr. 728).

normal findings (see Tr. 575 (6/27/16 - primary care visit noting worsening diabetes mellitus but reflecting no complaints of LLE numbness and grossly intact sensation), 580-83 (8/11/16 - consultative medical examination documenting complaints of left foot numbness but no finding of decreased sensation), 688-90 (5/9/17 - cardiologist office visit noting Plaintiff's report that she used cane for left foot numbness but finding no focal neurologic deficits and stating Plaintiff "doing great").

Accordingly, Plaintiff has failed to establish that the ALJ erred in evaluating her LLE loss of sensation and thus her second issue on review (like her first issue on review) falls short.

## 2. Evaluation of Medical Opinions

Plaintiff contends that the ALJ committed reversible error of law by failing to "consider all medical opinions given in the case, assess the weight given to each opinion," and explain the conflicts between the medical opinions and the RFC in his decision. (Docket Entry 14 at 13 (bold font and capitalization omitted) (citing 20 C.F.R. § 404.1527(b), and SSR 96-8p); see also Docket Entry 17 at 1-3.) In particular, Plaintiff asserts that the ALJ failed to "evaluate and assign weight to [emergency room physician Dr. Daniel T. Goodberry's] medical opinion" that Plaintiff must "rest four times per day as well as elevate her arms and legs particularly at night" (Docket Entry 14 at 13 (citing Tr. 705)), failed to provide an adequate rationale for discounting the opinion of treating

19

cardiologist Dr. Brandon N. Williams that Plaintiff could not "stand for a long time, walk or complete physical tasks as individuals with normal heart functioning would have no problem doing" (id. (citing Tr. 564)), and "wholly failed to mention, much less evaluate and assign weight to Dr. Williams'[s] May 10, 2018 finding that [Plaintiff] suffered from New York Heart Association ('NYHA') Stage III heart failure" (id. at 15 (citing Tr. 941, 947)). Those arguments fail as a matter of law.

### a. Dr. Goodberry

Dr. Goodberry, as a one-time emergency room examiner, does not constitute a treating source under the regulations (see 20 C.F.R. § 416.927(c)(2)) and thus his opinions, as a general proposition, do not warrant controlling weight, see Turberville v. Colvin, No. 1:11CV262, 2014 WL 1671582, at *6 (M.D.N.C. Apr. 23, 2014) (unpublished), recommendation adopted, slip op. (M.D.N.C. May 15, 2014) (Eagles, J.). The ALJ must nevertheless evaluate Dr. Goodberry's opinions using the factors outlined in the regulations and expressly indicate and explain the weight he or she affords to such opinions. See 20 C.F.R. § 416.927(c) ("Regardless of its source, [the ALJ] will evaluate every medical opinion [he or she] receive[s]" and, where an opinion does not warrant controlling weight, the ALJ must "consider all of the . . . factors [in 20 C.F.R. § 416.927(c)(1)-(6)] in deciding the weight [to] give to any medical opinion."); Social Security Ruling 96-5p, Medical Source

*Opinions on Issues Reserved to the Commissioner*, 1996 WL 374183, at 5* (July 2, 1996) ("SSR 96-5p") (noting that ALJs "<u>must</u> weigh medical source statements . . . [and] provid[e] appropriate explanations for accepting or rejecting such opinions" (emphasis added).[9]

Here, although the ALJ did not expressly discuss or weigh Dr. Goodberry's recommendation that Plaintiff must rest four times per day and elevate her arms and legs (Tr. 705), the ALJ did acknowledge Plaintiff's June 2017 emergency room visit with Dr. Goodberry, noting that Plaintiff "was negative for complaints of weakness, with a physical examination that was within normal limits" (Tr. 18 (citing Tr. 703)), and made "no reports of muscle aches or weakness" (<u>id.</u> (citing Tr. 703-04)).

Moreover, the ALJ's omission of an express discussion and weighing of Dr. Goodberry's recommendation does not constitute error, because the recommendation fails to qualify as a medical

___

[9] For benefits applications filed on or after March 27, 2017, the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. <u>See</u> Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs are no longer required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. <u>See</u> 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources"). Instead, an ALJ must determine and "articulate in [the] . . . decision how <u>persuasive</u> [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 416.920c(b) (emphasis added). In light of these changes to the rules governing the evaluation of opinion evidence, the SSA has also rescinded SSR 96-5p for claims filed on or after March 27, 2017. <u>See</u> 82 Fed. Reg. 15263 (Mar. 27, 2017). As Plaintiff applied for SSI prior to March 27, 2017 (<u>see</u> Tr. 177-86), this Recommendation will apply the regulations and rulings in effect at the time of Plaintiff's SSI application.

opinion under the regulations. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the plaintiff's] impairment(s), including [the plaintiff's] symptoms, diagnosis and prognosis, what [the plaintiff] can still do despite impairment(s), and [the plaintiff's] physical or mental <u>restrictions</u>." 20 C.F.R. § 416.927(a)(1) (emphasis added). A <u>recommendation</u> that a patient undertake certain ameliorative measures does not equate to a physical <u>restriction</u> or a judgment about what Plaintiff can still do despite her impairments. <u>See</u> <u>Cruz v. Commissioner of Soc. Sec.</u> <u>Admin.</u>, No. CV-19-04460, 2020 WL 3567033, at *2 (D. Ariz. July 1, 2020) (unpublished) (holding that "the ALJ was not obligated to include a need to elevate the legs when sitting in the RFC finding" or "to address that statement as a medical opinion," because the doctor "merely recommended that [the p]laintiff elevate her legs when sitting" and "did not state it was necessary for work" (internal quotation marks and brackets omitted)), <u>appeal filed</u>, No. 20-16651 (9th Cir. Aug. 26, 2020); <u>Valentine v. Commissioner of Soc. Sec. Admin.</u>, No. 1:18CV1887, 2019 WL 4395177, at *11 (N.D. Ohio July 23, 2019) (unpublished) (finding doctor's "recommend[ation] . . . that [the plaintiff] elevate his legs to treat his varicose veins" and "discharge instructions after an emergency room visit . . . to elevate his legs above the level of [his] heart when at rest" failed to qualify as "medical opinions

22

that [the plaintiff]'s varicose veins caused work-related functional limitations" (internal quotation marks omitted)), recommendation adopted, 2019 WL 4394168 (N.D. Ohio Sept. 13, 2019) (unpublished); Inscho v. Commissioner of Soc. Sec., No. CV 17-114, 2018 WL 4184340, at *1 n.2 (W.D. Pa. Aug. 31, 2018) (unpublished) (deeming the plaintiff's "portray[al of consultative psychological examiner]'s observations as an opinion as to [the p]laintiff's work-related limitations [] simply inaccurate," because "the section of the evaluation labeled 'Recommendations,' the section that came closest to offering opinions, set forth actions and situations from which [the p]laintiff would benefit, not things that she could or could not do"); Carpenter v. Berryhill, Civ. No. 16-179, 2017 WL 2909413, at *2 (E.D. Ky. May 12, 2017) (unpublished) (noting lack of clarity whether cardiologist's "advice that [the plaintiff] elevate his legs qualifie[d] as a 'medical opinion,'" because recommendation "never specified how high, how often, or for how long" the plaintiff must "elevate his legs" and "failed to explain how his treatment recommendation would restrict [the plaintiff]'s physical activity or limit his ability to perform work-related functions"). As Dr. Goodberry's recommendation did not constitute a medical opinion, the ALJ acted properly in not assigning it weight.

In Plaintiff's Reply, she contends that the United States Court of Appeals for the Fourth Circuit recently held that "a

23

physician's __directive__ to a patient to elevate her legs constitute[d] a medical opinion that require[d] weighing." (Docket Entry 17 at 2 (emphasis added) (citing __Stoker v. Saul__, 833 F. App'x 383 (4th Cir. 2020)).) According to Plaintiff, "as was the case in _Stoker_, Dr. Goodberry's __directive__ is consistent with and bolsters the supportability of [Plaintiff]'s testimony that she must elevate her feet when they swell." (__Id.__ (emphasis added) (citing Tr. 39, 54).)

Plaintiff's reliance on __Stoker__ falls short. In that case, the Fourth Circuit rejected the ALJ's rationale for discounting the treating physician's opinion that the plaintiff needed to elevate his legs while sitting because the physician's treatment notes lacked any such instruction. __See Stoker__, 833 F. App'x at 387 ("The absence of a physician's instruction or work restriction from treatment notes does not necessarily impact the credibility of the physician's opinion that the instruction or restriction would affect the claimant's ability to work."). Thus, the Fourth Circuit addressed an __opinion__ (or "directive" as Plaintiff called it (Docket Entry 17 at 2)) from a __treating__ physician, rather than, as here, a __recommendation__ from a __one-time__, emergency room physician. __See id.__ As a result, the Fourth Circuit did not reach the issue confronting the Court here of whether such a recommendation even qualifies as a "medical opinion" under Section 916.927(a)(1) in the first instance.

24

Nevertheless, even if Dr. Goodberry's recommendation amounted to a medical opinion, the ALJ's failure to assign it weight would amount to harmless error.  <u>See generally</u> <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").  Dr. Goodberry provided his recommendation in the setting of a one-time emergency room examination, at which Plaintiff presented with complaints of lower extremity swelling that had <u>resolved</u> by the time of admission and, consistently, Dr. Goodberry found <u>no edema</u> on examination. (<u>See</u> Tr. 703-05.)  Moreover, none of Plaintiff's treating doctors over the course of her extensive treatment history offered opinions that Plaintiff's impairments required her to elevate her legs (or arms) or to rest periodically throughout the day, thus indicating that Dr. Goodberry's recommendation amounted to nothing more than an isolated suggestion.  Finally, Dr. Goodberry's recommendation that Plaintiff elevate her arms and legs "particularly at night <u>while sleeping</u>" (Tr. 705 (emphasis added)) would have no bearing on Plaintiff's ability to perform work-related activities.

Under these circumstances, Plaintiff's challenge to the ALJ's failure to discuss and weigh Dr. Goodberry's recommendation entitles her to no relief.

**b. Dr. Williams**

Plaintiff first objects to the ALJ's decision to discount Dr. Williams's August 2016 opinion that Plaintiff could not "stand for a long time, walk, or complete physical tasks as individuals with normal heart functioning would have no problem doing" (Docket Entry 14 at 14 (citing Tr. 564)), because the opinion lacked "'vocational [sic] specific terms/limitations'" (id. (quoting Tr. 21)). According to Plaintiff, Dr. Williams's opinion "runs in direct conflict with the ALJ's RFC for light standing and walking . . . without even a limitation on [Plaintiff's] ability to stand or walk at one time." (Id.; see also id. (noting that "hallmark of light exertion work is that it 'requires a *good deal* of walking or standing - the primary difference between sedentary and most light jobs'" (emphasis supplied by Plaintiff) (quoting Social Security Ruling 83-10, <u>Titles II and XVI: Determining Capability to Do Other Work – the Medical-Vocational Rules of Appendix 2</u>, 1983 WL 31251, at *5 (1983) ("SSR 83-10")))).) Plaintiff's argument misses the mark.

The ALJ did not err by finding that Dr. Williams's opinion lacked "vocational [sic] specific terms/limitations." (Tr. 21.) Without quantifying "a longtime [sic]" (Tr. 564), Dr. Williams's opinion lends little guidance to the ALJ in determining how long Plaintiff could stand. Moreover, by opining that Plaintiff could not "walk or complete physical tasks" <u>to the extent individuals</u>

Case 1:20-cv-00277-TDS-LPA   Document 18   Filed 08/19/21   Page 26 of 38

with normal heart functioning could (Tr. 564), Dr. Williams merely indicated that Plaintiff had some, unquantified restriction in her ability to walk and complete physical tasks. See Bennett v. Commissioner of Soc. Sec., No. 1:07CV1005, 2011 WL 1230526, at *4 (W.D. Mich. Mar. 31, 2011) (unpublished) (characterizing podiatrist's "advi[ce] only against a 'long period' of standing and walking, without specifying what constituted a long period" as "too vague and conclusory to . . . be entitled to deference"). Under such circumstances, the ALJ properly afforded Dr. Williams's August 2016 letter limited weight. (See Tr. 21.)

Next, Plaintiff contends that an AICD interrogation report dated May 10, 2018, which lists Plaintiff's "NYHA Class" as "III" qualifies as a "medical opinion" from Dr. Williams which the ALJ failed to weigh (see Docket Entry 14 at 15 (citing Tr. 941, 947)), because such a classification constitutes "an expression of how symptoms limit an individual" (id. (citing Reed v. Berryhill, 337 F. Supp. 3d 525, 528 (E.D. Pa. 2018), and Rawlings v. Colvin, No. 3:14CV159, 2015 WL 3970608, at *7 (S.D. Ohio June 30, 2015) (unpublished)); see also Docket Entry 17 at 2-3). According to Plaintiff, "the whole purpose of the NYHA classification system is to grade the individuals [sic] symptoms and functional limitations" (Docket Entry 17 at 2) and "Class III heart failure patients have 'cardiac disease resulting in marked limitation of physical activity'" where "'[l]ess than ordinary activity causes fatigue,

27

palpitation, dyspnea, or anginal pain'" (id. at 2-3 (quoting The Criteria Committee of the New York Heart Association, *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels*, 253-56 (Little, Brown & Co. 9th ed. 1994)).  Plaintiff additionally appears to believe that the fact that Dr. Williams's electronic signature appears on the document further suggests that the report constitutes Dr. Williams's medical opinion. (See Docket Entry 14 at 15 (citing Tr. 947).)

Plaintiff's argument falters, because the notation in question appears on an AICD interrogation report which, as discussed above in connection with Plaintiff's first issue on review, appears to list Plaintiff's heart condition, i.e., LVEF 20% and NYHA Class III, at the time of her AICD implantation.  (Tr. 941.)  An ECG on August 18, 2017, measured Plaintiff's LVEF at 50 to 55 percent (see Tr. 749), and a transthoracic ECG dated October 13, 2017, reflected an LVEF of 30 to 35 percent (see Tr. 815-16); yet, the interrogation report occurring months later in May 2018 continued to list Plaintiff's LVEF as 20% (see Tr. 941; see also Tr. 968 (interrogation report dated December 13, 2017, listing LVEF as 20%)).  Accordingly, the interrogation report in question does not establish that Plaintiff's CHF continued to rate as NYHA Class III as of May 2018.

Plaintiff's attempt to interpret the NYHA Class III notation as a medical opinion from Dr. Williams fares no better.  Although

Dr. Williams signed off on the interrogation report (see Tr. 947), he neither provided any commentary on the continuing validity of Plaintiff's NYHA classification, nor offered any work-related restrictions that such a classification would entail (see Tr. 941-47). Moreover, on the same day as the AICD interrogation report, Dr. Williams examined Plaintiff, noted that she "[a]ppear[ed] stable" (Tr. 913), "seem[ed] to be doing well" (Tr. 910), and "[a]ctually [] look[ed] better than she ha[d] previously" (id.), documented Plaintiff's denial of chest pain, SOB, and edema (see id.), recorded oxygen saturation of 100% on room air, a normal gait, and "no increased work of breathing or signs of respiratory distress" (Tr. 912), and observed that her AICD was "functioning appropriately" (Tr. 913).

In light of the foregoing analysis, Plaintiff has not shown that the ALJ erred in his evaluation of the opinions of Drs. Goodberry and Williams, and the Court should deny relief on Plaintiff's third assignment of error.

### 3. Listing 4.02

Lastly, Plaintiff contends that "[t]he ALJ erred by failing to evaluate whether Plaintiff's CHF medically equals Listing 4.02." (Docket Entry 14 at 16 (bold font and single-spacing omitted); see also Docket Entry 17 at 3-5.) In that regard, Plaintiff argues that, "[d]espite its implication in this case with [Plaintiff] suffering from chronic CHF with numerous low LVEF readings (30% or

29

lower) in her file both during periods of stability as well as during acute events (Docket Entry 14 at 17 (citing Tr. 297, 376, 408, 693, 941, 968)), the ALJ did not mention, much less evaluate Listing 4.02 for CHF in his decision" (id. (citing Tr. 15-16)). Plaintiff concedes that "the record does not contain an exercise stress test or [a] statement that it is not safe for [Plaintiff] to perform one" (id.), but maintains that "Dr. Williams reiterated the presence of [Plaintiff's] risk [for sudden cardiac death] in May of 2018 when, during a period of stability, she still suffered from an [LV]EF of only 20%" (id. (citing Tr. 913, 941)). Thus, Plaintiff argues, her medical records show "the presence of another 'finding related to [that] impairment that [is] at least of equal medical significance to the required criteria.'" (Id. at 18 (citing 20 C.F.R. 404.1526(b)).) According to Plaintiff, she also "has evidence of symptoms which 'very seriously limit the ability to independently initiate, sustain, or complete activities of daily living' both in her testimony and in her medical records including her inability to get in and out of the shower on her own, dress on her own, her inability to stand long enough to wash dishes, an inability to prepare more than simple food such as cereal of sandwiches, her need to be driven around by her husband and her reliance on an electric scooter to simply get around a grocery store." (Id. (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x I, § 4.02).)

"Under Step 3, the [SSA's SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" <u>Radford v. Colvin</u>, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii) (internal bracketed numbers omitted)). "The listings set out at 20 CFR pt. 404, subpt. P, App. 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted).

"In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 160 (4th Cir. 1990) (citing <u>Zebley</u>, 493 U.S. at 530, and 20 C.F.R. 404.1526(a)); <u>see also</u> <u>Zebley</u>, 493 U.S. at 530 ("An impairment that manifests only some of those criteria [in a listing], no matter how severely, does not qualify."). "An impairment or combination of impairments medically equals a listing when it is <u>at least equal in severity</u> and duration to the criteria of any listed impairment." <u>Grimes v. Colvin</u>, No. 1:14CV891, 2016 WL 1312031, at *4 (M.D.N.C. Mar. 31, 2016) (unpublished) (Osteen, Jr., C.J.) (citing 20 C.F.R.

31

§ 416.926(a)-(b)) (emphasis added); <u>see also</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001) ("A finding of medical equivalence must be based on <u>medical</u> evidence only." (citing 20 C.F.R. § 404.1529(d)(3)) (emphasis added)). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall <u>functional</u> impact of [her] unlisted impairment or combination of impairments is as severe as that of a listed impairment." <u>Zebley</u>, 493 U.S. at 531 (emphasis added).

"[O]nly where there is <u>ample</u> evidence in the record to support a determination that a claimant's impairment meets or equals one of the listed impairments must the ALJ identify the relevant listed impairments and compare them to evidence of a plaintiff's symptoms." <u>Reynolds v. Astrue</u>, No. 3:11CV49, 2012 WL 748668, at *4 (W.D.N.C. Mar. 8, 2012) (unpublished) (emphasis added) (citing <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172-73 (4th Cir. 1986)); <u>see also</u> <u>Russell v. Chater</u>, No. 94-2371, 60 F.3d 824 (table), 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (unpublished) ("<u>Cook</u>, however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion [of listings] in all cases.").[10]

---

[10] The <u>Cook</u> court's confinement of the ALJ's duty to explicitly identify listings and compare their elements to the record to situations in which the claimant comes forward with "ample evidence" that an impairment meets a listing makes sense. "Step two of the [SEP] is a threshold question with a de minimis severity requirement," <u>Felton-Miller v. Astrue</u>, 459 F. App'x 226, 230 (4th Cir. 2011) (citing <u>Bowen v. Yuckert</u>, 482 U.S. 137, 153-54 (1987)), but "[t]he criteria in the medical listings [at step three] are demanding and stringent," <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (internal quotation marks omitted); <u>see</u>
(continued...)

To satisfy the criteria of Listing 4.02(A)(1) and (B)(1), a claimant must offer proof of "[CHF] while on a regimen of prescribed treatment" and "[m]edically documented . . . [s]ystolic failure . . . with . . . [LVEF] of 30 percent or less during a period of stability (not during an episode of acute heart failure) . . . AND

> . . . [p]ersistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom a[ medical consultant], preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 4.02. In this case, the ALJ did not err by omitting a discussion of Listing 4.02, because the record lacks "ample evidence" that Plaintiff's condition met or equaled that Listing, <u>Cook</u>, 783 F.2d at 1172-73.

Plaintiff's assertion that the record contains "numerous low LVEF readings (30% or lower) . . . both during <u>periods of stability</u> as well as during acute events" (Docket Entry 14 at 17 (emphasis

<hr>

[10](...continued)
also <u>Zebley</u>, 493 U.S. at 532 ("[The Social Security Administration] has set the medical criteria defining the listed impairments at a higher level of severity than the statutory [disability] standard."). Accordingly, the mere fact that an impairment qualifies as severe at step two does not suggest that it meets a listing at step three. No reason thus exists for courts to require ALJs to document the manner in which every impairment deemed severe at step two fails to meet a listing at step three; rather, common sense supports the Fourth Circuit's decision in <u>Cook</u> to insist that ALJs discuss a specific listing only when the claimant marshals "ample evidence" that an impairment actually meets the criteria for that listing. Nor does the more recent ruling in <u>Radford</u> counsel otherwise. Although the Fourth Circuit there remanded due to an ALJ's "insufficient legal analysis" at step three, it did so consistently with the standard set in <u>Cook</u>, as the record contained "probative evidence strongly suggesting that [the claimant] me[t] or equal[ed a particular listing]." <u>Radford</u>, 734 F.3d at 295.

added) (citing Tr. 297, 376, 408, 693, 941, 968)) misses the mark. Page 297 of the administrative transcript contains a report of a consultation with Dr. Williams on January 10, 2016, which references Plaintiff's LVEF of 20 percent (obtained via ECG on January 5, 2016 (see Tr. 331-33)). (See Tr. 297.) As this LVEF reading took place during Plaintiff's hospitalization for a heart attack and acute heart failure, it did not occur during a "period of stability" as required by Listing 4.02(A)(1).[11] Similarly, pages 376 and 408 of the record document hospitalizations for a stroke and acute systolic CHF decompensation with pulmonary edema, respectively, and thus those pages' references to an LVEF of 25 to 30 percent obtained through ECG on March 13, 2016 (see Tr. 399-401), do not establish a listing level LVEF occurring during a "period of stability" under Listing 4.02(A)(1). (See Tr. 376, 408.) Moreover, Plaintiff's citation to page 693 of the transcript does not aid her cause, as that page documents a trip to the emergency room on May 4, 2017, which merely references Plaintiff's past medical history ("PMHx") of an LVEF of 25 to 30 percent. (See Tr. 693.) As discussed above, pages 941 and 968 contain excerpts of AICD interrogation reports dated May 10, 2018, and December 13, 2017, respectively, which reflect Plaintiff's LVEF on the day of

---

[11] As the introductory section to the respiratory disorders listings explains, "[w]hen an acute episode of heart failure is triggered by a remediable factor, such as an arrhythmia, dietary sodium overload, or high altitude, cardiac function may be restored and a chronic impairment may not be present." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 4.00(D)(2)(b).

34

AICD implantation in January 2016 during the immediate aftermath of Plaintiff's heart attack and acute heart failure. (See Tr. 941, 968.) In short, the record lacks ample evidence that Plaintiff had LVEF readings at 30 percent or less during periods of stability, i.e., that she could meet the criteria of paragraph (A)(1) of Listing 4.02, and thus the ALJ did not err by omitting an express discussion of that Listing.

The record also does not contain ample evidence that Plaintiff could meet or equal the requirements of paragraph (B)(1) of Listing 4.02. As stated above, Plaintiff concedes that "the record does not contain an exercise stress test or [a] statement that it is not safe for [Plaintiff] to perform one" (Docket Entry 14 at 17) and, because the AICD interrogation reports merely reflect Plaintiff's LVEF in January 2016 at the time of implantation, Plaintiff's contention that "Dr. Williams reiterated the presence of [Plaintiff's] risk [for sudden cardiac death] in May of 2018 when, during a period of stability, she still suffered from an [LV]EF of only 20%" (id. (citing Tr. 913, 941)) lacks merit. Thus, Plaintiff has also not shown "the presence of another 'finding related to [her] impairment that [was] at least of equal medical significance to the required criteria.'" (Id. at 18 (quoting 20 C.F.R. 404.1526(b)).)

Lastly, Plaintiff argues that "the [C]ourt's review is limited to the reasons articulated by the ALJ[,] and the ALJ never made

35

th[e] argument [that Plaintiff lacked a qualifying LVEF] in support of his decision as again, he failed to even mention, much less evaluate whether [Plaintiff] met or medically equaled Listing 4.02." (Docket Entry 17 at 4 (citing Tr. 15-16, and, inter alia, Patterson v. Bowen, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.")).) Plaintiff's argument overlooks the fact that, where an ALJ has not provided any analysis regarding a particular listing, and a plaintiff alleges that sufficient evidence exists that she meets or equals that listing, the court necessarily must examine the record in order to determine whether "ample evidence" existed in the record that the plaintiff could have met or equaled the listing in question, much like a court must do when conducting a harmlessness analysis of an ALJ's error. See Bishop v. Commissioner of Soc. Sec., 583 F. App'x 65, 67 (4th Cir. 2014) (finding no post hoc rationalization where magistrate judge relied on certain evidence not cited by ALJ, noting that "any error [by the ALJ wa]s reviewed under the harmless error doctrine" and that, "if the decision '[wa]s overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding [wa]s a waste of time'" (quoting Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010))); see also Smith-Johnson v. Commissioner of Soc. Sec., 579 F. App'x 426, 435 (6th Cir. 2014) (noting that, "[u]ndoubtedly, there is a fine line between a post-hoc

36

rationalization and a determination as to whether the record evidence raises a substantial question" that the plaintiff met or equaled a listing, but concluding that district court's analysis did not constitute "an improper post-hoc rationalization of the ALJ's failure to consider Listing 12.05(C)"); Pumphrey v. Commissioner of Soc. Sec., No. 3:14CV71, 2015 WL 3868354, at *4 (N.D.W. Va. June 23, 2015) (unpublished) (rejecting the plaintiff's argument that, "because the ALJ did not analyze [L]isting 4.11 in her decision, the magistrate judge's determination that the record contained no evidence of chronic venous insufficiency was a post-hoc rationalization," and noting that the magistrate judge had to analyze whether "ample evidence [existed] in the record to support a determination that [the p]laintiff's impairment met or equaled Listing 4.11B").

Put simply, Plaintiff has not shown that the ALJ erred by failing to analyze whether Plaintiff's CHF met or equaled Listing 4.02.

### III. CONCLUSION

Plaintiff has not established grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) be denied, that

Defendant's Motion for Judgment on the Pleadings (Docket Entry 15)

be granted, and that judgment be entered dismissing this action.

                              _____
                                  /s/ L. Patrick Auld
                                **L. Patrick Auld**
                        **United States Magistrate Judge**

August 19, 2021